UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------X

MEI LING LIN,

                              Plaintiff,

               -v-

CITY OF NEW YORK, COMMISSIONER JAMES P.
O'NEILL, DEPUTY INSPECTOR RUSSELL GREENE,
LIEUTENANT DOMINICK MARANZANO,
SERGEANT BRIAN HUGHES, POLICE OFFICER
JOHN KAISER, POLICE OFFICER MARKOV,
POLICE OFFICER VELLEGAS, and POLICE OFFICER
SUCUZHANAY,

                           Defendants.

------------------------------------------------------------------X

14 Civ. 9994 (PAE)

<u>OPINION & ORDER</u>

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 12-21-16

PAUL A. ENGELMAYER, District Judge:

      This decision resolves a summary judgment motion in a case bringing a variety of federal

and state-law claims of police misconduct.  Plaintiff Mei Ling Lin brings claims under 42 U.S.C.

§ 1983 for false arrest, malicious prosecution, excessive force, and unlawful search and seizure,

along with parallel claims under state law for false arrest and malicious prosecution, against the

City of New York (the "City") and New York City Police Department ("NYPD") officials.[1]  She

also brings state-law claims against various defendants for assault and battery, and against the

---

[1] In the case caption, defendant Officer Markov is spelled "Mankov."  According to defendants,
this defendant's last name is actually spelled "Markov."  Declaration of Tavish Deatley in
Support of Defendants' Motion for Summary Judgment, Dkt. 69, at 1 n.1.  The Court therefore
refers to this defendant as "Markov," and the Clerk of Court is respectfully directed to amend the
caption to correct the spelling of "Mankov" to "Markov."  In addition, the Court substitutes
NYPD Commissioner James P. O'Neill as a defendant for William Bratton, the former
commissioner.  Although Bratton was sued in his individual and official capacities, Lin has
adduced no facts on which he might be individually liable.  Hence, substitution for his official
successor is appropriate.

City and James P. O'Neill for *respondeat superior* liability to the extent of the individual

defendants' liability, along with a § 1983 claim against the City and O'Neill for negligent hiring

and training.  These claims arise from Lin's arrest on March 6, 2014 inside the Bronx restaurant

she owns with her husband and the brief detention that followed.

Defendants now move for summary judgment on all claims, arguing that (1) Lin's arrest

was supported by probable cause, (2) there was no malicious prosecution, (3) excessive force

was not used, (4) the search and seizure of Lin's purse to find her identification was reasonable,

and (5) defendants are protected by qualified immunity.  Defendants also seek dismissal of Lin's

municipal liability claim against the City and O'Neill for negligent hiring and training.  For the

following reasons, the Court grants summary judgment to defendants as to all of Lin's claims

under federal law and state law, except for her claim under § 1983 of an unlawful seizure and

search of her purse.

I.     **Background**[2]

---

[2] The Court draws its account of the underlying facts from: the parties' respective submissions
on the motion for summary judgment, including each's Statement Pursuant to Local Civil Rule
56.1, *see* Dkt. 68 ("Def. 56.1") and Dkt. 74 ("Pl. 56.1); the Declaration of Tavish Deatley in
support of defendants' motion, Dkt. 69 ("Deatley Decl."), and attached exhibits; the declaration
of Chunyu Jean Wang in support of plaintiff's opposition, Dkt. 75 ("Wang Decl."), and attached
exhibits.  The exhibits attached to the parties' declarations occasionally overlap.  The Court has
reviewed all exhibits each party has submitted; when the Court cites to a declaration attached by
each party's submission by reference only to one exhibit, it does so for convenience.  Similarly,
when the Court cites to a deposition, it does so without regard to whether the particular page
being cited was included as an exhibit to the Deatley Declaration or the Wang Declaration.
When the Court cites to the defendants' 56.1 statement, it does so for facts or for parts of facts
that are undisputed or substantively undisputed by Lin, as detailed in plaintiff's 56.1 statement.

A particularly salient exhibit is the video file attached as Exhibit O to the Deatley Declaration
("Video"), which is a copy of surveillance footage in Lin's restaurant capturing critical aspects
of Lin's encounter with the police on March 6, 2014.  The Video reflects footage from three
cameras, two depicting the interior of the Fu Xing restaurant from different angles and the third
depicting the area of the street and sidewalk outside the entrance to the restaurant.  Defendants
time-synced the three videos.  Deatley Decl. ¶ 16.  The videos are of slightly differing lengths,

### A.    Factual Background

On the evening of March 6, 2014, Lin was working at the Fu Xing restaurant, a Chinese restaurant she owns and operates with her husband, Def. 56.1 ¶¶ 5, 8, located at 1270 Morrison Avenue in the Bronx.  Dkt. 1 ("Complaint") ¶ 19.  Fu Xing is a small restaurant with a take-out counter and one to two tables.  *Id.* ¶ 10; *see e.g.*, Video 21:20:13.  Fu Xing did not have a license to sell or permit the consumption of liquor or beer.  Def. 56.1 ¶ 6.  Lin was then six to seven months pregnant.  She was wearing a zipped-up winter coat inside the restaurant.  *Id.* ¶¶ 9, 12.

At 9:26 p.m., a police van stopped outside the restaurant.  *Id.* ¶ 21.  Defendants Sergeant Vellegas and Officer Sucuzhanay, along with non-party Officer Oh, had been driving down Morrison Avenue in the van when they observed a customer in the Fu Xing restaurant drinking from a bottle inside a bag.  *Id.* ¶ 18; Deatley Decl., Ex. G ("Vellegas Dep."), at 10–11, 13.  The customer was standing at a table next to the clear-glass-wall front of the restaurant and also had a

---

but they all cover the time between 9:15:54 p.m. and 9:40:54 p.m.  The video depicting the street and sidewalk outside the entrance to the restaurant is the longest; it runs from 9:13:43 to 9:59:59 p.m.  Two of these videos—those depicting the restaurant's interior—were separately attached by plaintiff as Exhibit K to the Wang Declaration.  One of these videos lasts 27 seconds longer in the version attached to plaintiff's Wang Declaration than in the version attached to defendants' Deatley Declaration, but this extra footage is irrelevant, as no people are depicted during those 27 seconds of footage.  As a result, the Court cites here only to the Video (*i.e.*, as attached to the Deatley Declaration), because it captures all relevant content.  The Video is silent.  The Court cites the Video according to the time stamp shown at the top of its view.

Citations to a party's 56.1 statement incorporate the evidentiary materials cited therein.  When facts stated in a party's 56.1 statement are supported by testimonial, video, or documentary evidence and not denied by the other party, or denied by a party without citation to conflicting admissible evidence, the Court finds such facts to be true.  *See* S.D.N.Y. Local Civil Rule 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in statement required to be served by the opposing party."); *id.* Rule 56.1(d) ("Each statement by the movant or opponent . . . controverting any statement of material fact[] must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c).").

bag containing food he had purchased from the restaurant. *Id.*; *e.g.*, Video 21:17:00–21:27:06. Based on this observation and their experience, Vellegas and Sucuzhanay believed the bottle contained alcohol. Vellegas Dep. 11, 13; Deatley Decl., Ex. K ("Sucuzhanay Dep."), at 9. At that time and during the preceding several minutes, Lin had been working in the restaurant cleaning the front dining and counter area; she then moved towards the back-kitchen area of the restaurant and worked there, with another employee, in food preparation. *E.g.*, Video 21:17:26–21:26:16. During this time, Lin and the customer drinking from the bottle interacted with each other occasionally. *See, e.g.*, Video 21:17:30–21:18:40, 21:24:00–21:24:33.

When the van stopped outside the restaurant, the person drinking the bottle looked toward the police van, and then passed the bag containing the bottle to the other Fu Xing employee working behind the counter. Lin was standing next to the other employee at the time when he accepted, from the customer, the bag containing the bottle. Def. 56.1 ¶¶ 22–23; *see also* Video 21:26:50–21:27:06.

Officers Sucuzhanay and Oh entered the restaurant at 9:27 p.m. and spoke with the customer. Def. 56.1 ¶¶ 24–26. Sucuzhanay then approached the counter, and spoke with Lin and the other employee and requested the bottle. *Id.* ¶ 27. The employee handed Sucuzhanay the black plastic bag containing the bottle from behind the counter. *Id.* ¶ 29. Sucuzhanay saw that the bottle was a Coors Light beer. Sucuzhanay Dep. 11. The officers then removed the bottle from the bag, inspected it, confronted the customer with it, and photographed it, before giving it back to the other Fu Xing employee, who took it behind the counter and out of the camera's view. Video 21:27:49–21:29:11. Defendant Lieutenant Maranzano entered the restaurant at 9:31:58 p.m., Def. 56.1 ¶ 30, and, with the assistance of the other officers, placed

the customer, who had an open arrest warrant, in handcuffs and led him out of the restaurant. *Id.* ¶ 31; Video 21:31:58–21:32:47; Sucuzhanay Dep. 12.

The actions that occurred thereafter are captured on the Video, but because the Video is soundless, it is not revealing as to the participants' words.[3] Maranzano returned to the restaurant at 9:33 p.m. and spoke with Lin. Def. 56.1 ¶ 32. Maranzano asked her for her identification between five and 10 times, *id.* ¶¶ 34–35, but Lin did not provide it, *id.* ¶ 39. Lin testified in her deposition that she did not understand that Maranzano was asking for her identification, and instead believed he was asking for her husband's identification, Wang Decl., Ex. B ("Lin Depo."), at 48–50, although, in a post-incident phone call on March 6, 2014 to the NYPD Internal Affairs Bureau Command Center, Lin admitted that she had understood that it was her identification that the officers were seeking, and explained that she had not provided it because she did not have it at the time, *see* Deatley Decl., Ex. N, at 7–9. Maranzano then told Lin that if she did not provide identification, she would be placed under arrest. Def. 56.1 ¶ 37. Lin still did not provide her identification, and moved behind the counter while still in conversation with Maranzano. *Id.* ¶¶ 39–40. At this time, Maranzano was holding handcuffs in his hand. Video 21:34:30. Also, at this time, two officers, including Maranzano, were in the restaurant. *Id.*

---

[3] Insofar as the Video does depict events, the Video is reliable objective evidence on which the Court may rely on summary judgment. "Although on summary judgment the evidence must be viewed in the light most favorable to Plaintiff[] as the non-moving part[y], when there is reliable objective evidence—such as a recording—the evidence may speak for itself." *Marcavage v. City of New York*, 689 F.3d 98, 110 (2d Cir. 2012) (rejecting plaintiffs' "characteriz[ation of] their behavior toward the [arresting] officers as cordial" because "audio recording show[ed] indisputably that they were neither courteous nor complaint") (citing *Scott v. Harris*, 550 U.S. 372, 378–81 (2007) (rejecting non-movant's account of police chase because it was "so utterly discredited by the [video recording] that no reasonable jury could have believed him")); *see also MacLeod v. Town of Brattleboro*, No. 10 Civ. 286, 2012 WL 5949787, at *7 (D. Vt. Nov. 28, 2012) ("In assessing whether there are triable issues of fact, the court may rely on facts as claimed by the nonmoving party.") (citing *Scott*, 550 U.S. at 379–81), *aff'd*, 548 F. App'x 6 (2d Cir. 2013) (summary order).

Around this time, Lin moved behind the counter, and Maranzano grabbed her wrist, and held onto it for approximately 14 seconds, releasing it at 9:34:56 p.m. Lin then moved from behind the counter. *Id.* 21:34:36–21:35:00; *see also* Def. 56.1 ¶. Over the next several minutes, additional officers entered the restaurant, and Lin variously spoke with Maranzano and the other officers.

Eventually, at 9:36:24 p.m., Maranzano went behind the counter and continued to talk with Lin. Def. 56.1 ¶ 47. He grabbed an object, apparently a flip-style cell phone, out of her hand and placed it on the counter, and then placed his hands into the right and then the left pockets of her coat. Video 21:36:24–21:36:36. At this point there were at least seven officers, including Maranzano, in the restaurant. Video 21:36:32. Lin continued to speak with the various officers. At 9:38:00 p.m., the other restaurant employee reached for the object on the counter, and Maranzano snatched it out of his hand. *Id.* 21:38:00. Maranzano then moved towards Lin to arrest her. He grabbed her arm to handcuff her, and in the process Lin fell to the ground. She was helped up by Maranzano and defendant Officer Kaiser.

By 9:38:28 p.m., Lin was in handcuffs and was in the process of being moved out of the restaurant by Maranzano and Kaiser. She dragged her feet on the ground in the restaurant, but then used her legs to walk backwards towards the van while on the sidewalk, while she was being grasped at the arms by officers who are leading her to the van. Video 21:38:00–21:39:00. In an effort to place Lin into the van, a non-party officer pushed against Lin's back and tried to lift her into the van. Def. 56.1 ¶¶ 60–61. While outside, Lin was searched by female police officers. *Id.* ¶ 62.

Maranzano, along with Sucuzhanay, then returned to the restaurant from the street, Video 21:39:05; Def. 56.1 ¶ 63. Maranzano asked the restaurant employee for Lin's wallet.

Sucuzhanay Dep. 25.  The restaurant employee then reached for the purse on a shelf underneath the counter, opened it and looked in it briefly, and then handed the purse to Maranzano. Maranzano and Sucuzhanay brought the purse to a table and looked through it, and Sucuzhanay eventually handed it back to the restaurant employee, who took it back behind the counter. Video 21:39:07–21:40:22.  Maranzano's and Sucuzhanay's search of the purse lasted about 40 seconds; after Maranzano had located Lin's identification, he exited the restaurant.  *Id.* ¶ 66. Sucuzhanay then placed items back into Lin's purse and returned the purse to the restaurant employee.  Video 21:39:58–21:40:10; Def. 56.1 ¶ 67.  At 9:43 p.m., Maranzano returned to the restaurant and retrieved the bottle from the back of the restaurant, and then exited and walked to the police van.  Video 21:42:53–21:43:35.

Precisely what was said between by Lin and Maranzano and the other officers is a matter of dispute.  Maranzano testified in his deposition that Lin spoke English well enough for her and Maranzano to understand each other—and that they did understand each other.  Deatley Decl., Ex. F ("Maranzano Dep."), at 16–17.  He testified that he decided that a ticket should be issued to the owner of the Fu Xing restaurant, and that he determined Lin was the owner because when he asked for the owner Lin spoke to him and told him that she and her husband owned the restaurant.  *Id.* at 17.  Lin testified in her deposition that she did not know why the customer was arrested, and that, after he was arrested, when Maranzano returned to the restaurant, he asked her who the owner of the restaurant was.  Wang Decl., Ex. B. ("Lin Dep."), at 46–47.  Lin testified that, in response, she told him that her husband is the restaurant's owner and that he was not there that day.  *Id.* at 47.  She testified that she had thought that when the officers were asking for identification, which they requested at least five to 10 times, they were asking for her husband's

identification. *Id.* at 48. After Lin did not provide the officers with identification, they placed her in handcuffs and brought her outside of the restaurant to the police van.

After finding Lin's identification in her purse, Sucuzhanay issued her a summons for a violation of New York Alcoholic Beverage Control Law ("ABC") § 54(5). Def. 56.1 ¶¶ 69–70. Defendant Officer Markov, who had not witnessed the preceding events, checked the summons Sucuzhanay issued to make sure the captions on it were properly completed. *Id.* ¶¶ 71–72.

After Lin was given the summons, the handcuffs on her were removed and she was released from the police van and from custody. *Id.* ¶ 73. At 9:52:40 p.m., Lin exited the van and walked by herself to the restaurant. *Id.* ¶ 74; Video 21:52:40–21:52:50. Lin had been in the police van for approximately 13 minutes. Def. 56.1 ¶ 75. At 9:53:06 p.m. Lin exited the restaurant and walked to the van, and then walked back to the restaurant, by herself, at 9:53:47 p.m. *Id.* ¶¶ 76–77; Video 21:53:06–21:53:50.

Later that evening, Lin called the NYPD Internal Affairs Bureau Command Center to report the incident. Def. 56.1 ¶ 78. While on the phone with the Command Center, Lin stated that her stomach hurt. *Id.* ¶ 79. She was later transported by ambulance to Jacobi Medical Center. *Id.* ¶ 80. Lin received medical care at the hospital, and was subsequently released. *Id.* ¶ 82. The records from Jacobi Medical Center indicate that Lin complained of being pushed by the police and falling to the floor on her rear end. They contain a note stating that Lin "doesn't think she hit the stomach. No bleeding, no leaking," Deatley Decl., Ex. P, at 301, although Lin testified in her deposition that she experienced some sort of vaginal leaking following the March 6, 2014 incident, Lin Dep. 83.

Lin made one court appearance in connection with the summons issued to her on March 6, 2014.  Def. 56.1 ¶ 85.  On May 22, 2014, the summons was dismissed for legal insufficiency. *Id.* ¶ 86; Deatley Decl., Ex. M.

Lin complained afterwards of several injuries resulting from the allegedly excessive force used in her arrest, although she did not claim that the handcuffs were applied too tightly.  She explained in her deposition that, at the time of her arrest, "I didn't consider whether the handcuff was tight or not.  I only consider my baby at that time."  Lin Dep. 66.  Lin did state that her wrists were red and swollen as a result of the handcuffing, but that the redness and swelling went away within a couple of days of her arrest.  Def. 56.1 ¶¶ 88–89; Lin Dep. 110.  She was placed in the police van by a non-party officer, who pushed against her back and tried to lift her into the van.  *Id.* ¶ 61.

On March 11, 2014, Lin went to a doctor complaining of tiredness, muscle fatigue, and nightmares, although the records from this visit indicate that she denied symptoms of abdominal pain, vomiting, bleeding, and bruising.  *Id.* ¶¶ 91–92.  Based upon this visit, Lin was diagnosed with mild anxiety.  *Id.* ¶ 93.  Lin's baby was later born healthy, with no complications during childbirth, and has not been diagnosed with any adverse medical conditions.  *Id.* ¶ 94.

### B. Procedural History

On December 18, 2014, Lin filed the complaint in this case.  Dkt. 1.  On March 30, 2015, defendants filed an answer.  Dkt. 15.  Mediation attempts failed to produce a settlement and terminated on July 9, 2015.  Dkt. 16.  A later settlement conference before Magistrate Judge Andrew J. Peck also failed to produce a settlement.  Dkt. 23.

On March 7, 2016, the Court held a pre-motion conference.  *See* Dkt. 71.  On March 28, 2016, defendants filed a motion for summary judgment on all claims, Dkt. 67, along with a Rule

56.1 statement, Def. 56.1, a memorandum of law, Dkt. 70 ("Def. Br."), and the Deatley

Declaration and attached exhibits including the video footage as Exhibit O, in support.  On April

18, 2016, Lin filed a memorandum in opposition, Dkt. 73 ("Lin Br."), the Wang Declaration and

supporting exhibits, and a counter Rule 56.1 statement, Dkt. 77 ("Pl. 56.1"), along with two of

the videos as Exhibit K to the Wang Declaration, *see* Dkt. 76.  On April 28, 2016, defendants

filed a reply memorandum, Dkt. 78, and an additional supporting declaration by Deatley, Dkt.

79.  On May 26, 2016, Lin filed, as an attachment to a letter, the transcript from her state

criminal court proceedings relating to the summons issued in connection with her arrest at issue

in this case.  Dkt. 80.

## II.    Applicable Legal Standards for a Motion for Summary Judgment

To prevail on a motion for summary judgment, the movant must "show[] that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law."  Fed. R. Civ. P. 56(a).  The movant bears the burden of demonstrating the absence of a

question of material fact.  In making this determination, the Court must view all facts "in the

light most favorable" to the non-moving party.  *Holcomb v. Iona Coll.*, 521 F.3d 130, 132 (2d

Cir. 2008); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

If the movant meets its burden, "the nonmoving party must come forward with

admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary

judgment."  *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008).  "[A] party may

not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion

for summary judgment."  *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (internal quotation

marks and citation omitted).  Rather, the opposing party must establish a genuine issue of fact by

"citing to particular parts of materials in the record."  Fed. R. Civ. P. 56(c)(1)(A); *see also*

*Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009).

"Only disputes over facts that might affect the outcome of the suit under the governing

law" will preclude a grant of summary judgment.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

248 (1986).  In determining whether there are genuine issues of material fact, the Court is

"required to resolve all ambiguities and draw all permissible factual inferences in favor of the

party against whom summary judgment is sought."  *Johnson v. Killian*, 680 F.3d 234, 236 (2d

Cir. 2012) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)) (internal quotation

marks omitted).

## III.    Discussion

Lin's primary claim (both under § 1983 and under state law) is for false arrest, although

she also brings claims for malicious prosecution, excessive force, and unlawful search and

seizure.  In moving for summary judgment, defendants argue that there was probable cause to

arrest Lin for violating the ABC; that, in any event, that the arrest was protected under the

qualified immunity doctrine; and that, as a matter of law, the evidence cannot establish her other

claims.  Defendants also argue that the claims against O'Neill and Russell Greene should be

dismissed for a lack of personal involvement.  Def. Br. at 22–25.  Lin opposes defendants'

motions.  The Court assesses the evidence supporting Lin's various claims in turn.

### A.    False Arrest

#### 1.    Legal Standards Governing False Arrest Claims

Section 1983 provides redress for a deprivation of federally protected rights by persons

acting under color of state law.  42 U.S.C. § 1983.  To prevail on a § 1983 claim, a plaintiff must

establish (1) the violation of a right, privilege, or immunity secured by the Constitution or laws

of the United States (2) by a person acting under the color of state law.  *West v. Atkins*, 487 U.S. 42, 48 (1988); *Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 155–56 (1978).

"A § 1983 claim for false arrest, resting on the Fourth Amendment right of an individual to be free from unreasonable seizures, including arrest without probable cause, is substantially the same as a claim for false arrest under New York law." *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996), *cert. denied*, 528 U.S. 946 (1999) (internal citations omitted); *accord Jenkins v. City of New York*, 478 F.3d 76, 84 (2d Cir. 2007).  Under New York law, a plaintiff bringing a claim for false arrest must show that "(1) the defendant intended to confine [the plaintiff], (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged." *Singer v. Fulton Cty. Sheriff*, 63 F.3d 110, 118 (2d Cir. 1995) (quoting *Broughton v. State of New York*, 335 N.E.2d 310, 314 (N.Y. 1975)) (internal quotation marks omitted).

A confinement is privileged where the arresting officer had probable cause to arrest.  *See Jocks v. Tavernier*, 316 F.3d 128, 135 (2d Cir. 2003); *Jenkins*, 478 F.3d at 84 ("The existence of probable cause to arrest constitutes justification and is a complete defense to an action for false arrest, whether that action is brought under state law or under § 1983." (internal quotation marks and citation omitted)).  Probable cause exists "when the arresting officer has knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested." *Lacey v. Daly*, 26 F. App'x 66, 67 (2d Cir. 2001) (summary order) (quoting *Singer*, 63 F.3d at 119) (internal quotation marks omitted).  Whether probable cause existed is a commonsense inquiry.  It is to be based on the totality of the circumstances not on reflexive, isolated, or technical criteria.  *See,*

*e.g.*, *Illinois v. Gates*, 462 U.S. 213, 232 (1983); *United States v. Falso*, 544 F.3d 110, 117 (2d Cir. 2008); *United States v. Delossantos*, 536 F.3d 155, 159 (2d Cir. 2008).

The lawfulness of an arrest does not depend on an ultimate finding of guilt or innocence. *Pierson v. Ray*, 386 U.S. 547, 555 (1967); *Wiltshire v. Wanderman*, No. 13 Civ. 9169 (CS), 2015 WL 4164808, at *3 (S.D.N.Y. July 10, 2015) (that charges were later dropped is "irrelevant" to question of whether probable cause existed at time of arrest). Rather, "[w]hen determining whether probable cause exist[ed] courts must consider those facts *available to the officer* at the time of the arrest." *Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006) (internal quotation marks and citation omitted) (emphasis in *Panetta*); *accord Devenpeck v. Alford*, 543 U.S. 146, 152 (2004) ("Whether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest.").

Moreover, "probable cause does not require an awareness of a particular crime, but only that some crime may have been committed." *Ackerson v. City of White Plains*, 702 F.3d 15, 20 (2d Cir. 2012) (internal quotation marks and citation omitted). Accordingly, "it is not relevant whether probable cause existed with respect to each individual charge, or, indeed, any charge actually invoked by the arresting officer at the time of arrest." *Jaegly v. Couch*, 439 F.3d 149, 154 (2d Cir. 2006). "[A]n arrest is not unlawful so long as the officer ha[d] . . . probable cause to believe that the person arrested [] committed *any crime*." *Zellner v. Summerlin*, 494 F.3d 344, 369 (2d Cir. 2007) (emphasis added). So long as an arrest is supported by probable cause, a person may be arrested for a violation of any offense, no matter how minor, so long as that offense is a crime. *See, e.g.*, *Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001) ("If an officer has probable cause to believe that an individual has committed even a very minor

criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender.").

In a lawsuit claiming false arrest, "[t]he burden of establishing the absence of probable cause rests on the plaintiff." *Berry v. Marchinkowski*, 137 F. Supp. 3d 495, 524 (S.D.N.Y. 2015) (internal quotation marks omitted). The Court may determine, as a matter of law, whether probable cause existed where there is no dispute as to the pertinent events or the knowledge of the arresting officers. *Weyant*, 101 F.3d at 852.

### 2. Legal Standards Governing Qualified Immunity

Even if there was not probable cause to arrest the plaintiff, an officer will be entitled to qualified immunity if "arguable probable cause" existed—*i.e.*, if "a reasonable police officer in the same circumstances and possessing the same knowledge as the officer in question *could* have reasonably believed that probable cause existed in the light of well established law." *Cerrone v. Brown*, 246 F.3d 194, 202–03 (2d Cir. 2001) (internal quotation marks and citation omitted). The doctrine of qualified immunity provides a complete defense where "either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met." *Golino v. City of New Haven*, 950 F.2d 864, 870 (2d Cir. 1991); *accord Posr v. Court Officer Shield No. 207*, 180 F.3d 409, 416 (2d Cir. 1999). Its purpose is to "give[] government officials breathing room to make reasonable but mistaken judgments" and to protect "all but the plainly incompetent or those who knowingly violate the law." *City & Cty. of San Francisco v. Sheehan*, 135 S. Ct. 1765, 1774 (2015) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011)) (internal quotation marks omitted).

### 3. Assessment of Lin's Claims

Under the ABC, a license is required for an establishment to sell beer, both at retail and for consumption on the premises of the establishment.  N.Y. Alco. Bev. Cont. § 55(2) ("Such a license shall contain a description of the licensed premises and in form and in substance shall be a license to the person therein specifically designated to sell beer in the premises therein specifically licensed, at retail, to be consumed upon such premises.  Such a license shall also include the privilege of selling beer at retail to be consumed off the premises.").[4]  Under the case law, a license also appears to be required for an establishment to permit patrons to consume beer on its premises.  *See, e.g.*, *Seidenberg v. McSorleys' Old Ale House, Inc.*, 317 F. Supp. 593, 601 (S.D.N.Y. 1970) ("McSorleys' is the holder of a retail beer license for *on-premises consumption* issued under § 55 of the [Alcoholic Beverage Control] Law." (emphasis added)).  While the ABC sets out punishments for certain violations, a violation of any other ABC provision is a misdemeanor.  N.Y. Alco. Bev. Cont. § 130(3) ("Any violation by any person of any provision of this chapter for which no punishment or penalty is otherwise provided shall be a misdemeanor. . . .").

Here, on the undisputed facts, the officers had probable cause—or, at a minimum, it was reasonable for the officers to believe they had probable cause—to arrest Lin for permitting the consumption of beer on the premises of the restaurant she owned.  The undisputed testimony of Officers Sucuzhanay and Villegas is that they observed the customer in the restaurant drinking from a bag that they, from their observation and experience, believed to be—and proved to be— a bottle of beer.  Vellegas Dep. 11, 13; Sucuzhanay Dep. 9, 11.  Lin had been cleaning the front of the restaurant, in close proximity to the customer, for several minutes, and had interacted with

---

[4] Other provisions of the ABC contain similar prohibitions for other alcoholic beverages.  *See* N.Y. Alco. Bev. Cont. §§ 64 (liquor), 81 (wine).

him.  *See, e.g.*, Video 21:17:30–21:18:40, 21:24:00–21:24:33.  Sucuzhanay testified that he saw the customer give a restaurant employee the plastic bag which contained the beer bottle and that the employee took it behind the counter.  Sucuzhanay Dep. 9.   Sucuzhanay then asked the employee for the bag containing the bottle; after some initial reluctance, the employee eventually brought it to Sucuzhanay from behind the counter.  *Id.* at 10–11.  Vellagas, in turn, testified that although he did not see Lin sell or give alcohol to the customer, he believed that she permitted the alcohol to be consumed in the restaurant because, while situated next to the customer while the customer drank the beer, she did not ask the customer to leave.  Villegas Dep. 23.  And, before the arrest was made, Maranzano had a solid basis to conclude Lin was the restaurant's owner, because, he testified, after he asked for the owner, she spoke to him at length.  Maranzano Dep. 17.   Lin does not counter that fact, although she does counter Maranzano's testimony that she identified herself as the owner along with her husband, *id.*, attesting that she told Maranzano that her husband, who was not there that day, was the owner, Lin Dep. 47.

   At a minimum, the undisputed facts gave the officers on the scene a sufficient factual basis to reasonably conclude that there was probable cause that Lin had violated the ABC and could properly be arrested, making the arrest of Lin one protected by qualified immunity.  The officers had observed the customer drinking a beer in the restaurant.  There was no indication that the restaurant had a license to sell alcohol—and, in fact, it did not—as the restaurant did not sell alcoholic beverages.  It was reasonable to believe that the restaurant was permitting the consumption of alcohol, because, during the time the customer drank from the bottle, the officers saw both Lin and the restaurant's employee near him in the small quarters of the restaurant, they did not ask him to leave, and the employee actually accepted the bottle from him and brought it behind the counter, only reluctantly bringing it back to Sucuzhanay after he requested it.  And,

16

they were reasonable in believing that Lin (as in fact was so) was an owner of the restaurant—and an appropriate person to whom the summons should be issued—because, after Maranzano asked for the owner, Lin spoke to him at length.[5]   These facts made it reasonable for the officers to believe that probable cause that Lin had permitted the consumption of alcohol in a restaurant lacking a license, so as to justify her arrest.[6]

Lin's arguments in response are unavailing.  First, Lin argues that ABC § 55 does not make it a crime for an unlicensed restaurant to permit consumption of alcohol on its premises. Lin Br. at 1–2.  She claims instead that this provision criminalizes only the sale of beer on such premises, and that the only consumption that is made criminal under the statute is consumption after an unlawful sale.  To be sure, the text of the ABC is not fully clear on this point.  But it can reasonably be read to prohibit an unlicensed restaurant from countenancing the consumption of alcohol on its premises, and such a reading is supported by the decision in *Seidenberg*, 317 F. Supp. 593 at 601, and by the fact that the New York State Liquor Authority, which issues

---

[5] On defendants' motion for summary judgment, the Court must accept Lin's version of events as to what she said to the officers about who owned the restaurant.  Lin's admission that she was married to the owner did not make the officers' conclusion, based her conduct in speaking to the officers when they asked for the owner, unreasonable.

[6] *Cf. Patterson v. Labella*, No. 6:12-cv-1572 (MAD/TWD), 2014 WL 4892895, at *16 (N.D.N.Y. Sept. 30, 2014) (showing of probable cause "overwhelming" that plaintiff was operating an unlicensed "bottle club" in violation of ABC § 64-b, which requires a license for an assemblage of 20 or more persons for the purpose of consuming alcohol, where full and empty alcohol containers were scattered throughout premises, there was a bartender, more than 20 people were present in the premises, alcohol had been consumed, and alcohol was behind the bar, even though video evidence did not actually depict anyone consuming alcohol); *Stone v. Port Auth. of New York and New Jersey*, No. 11 Civ. 3932 (SMG), 2014 WL 3110002, at *7 (E.D.N.Y. July 8, 2014) (officer had probable cause to arrest plaintiff for violating ABC §§ 64-b and 96, which prohibits storing alcohol without a permit on unlicensed premises, when officer observed a "substantial amount" of alcohol stored in a mechanical room adjacent to a restaurant, learned from other officers that the restaurant lacked an alcohol license, and plaintiff owned adjacent restaurant that had previously obtained only temporary liquor licenses).

licenses under the ABC, takes the position that an unlicensed business violates the ABC when it permits customers to bring their own alcohol to the business for on-premises consumption. Deatley Decl., Ex. S.  Lin cites no contrary case law.  The officers' arrest of Lin for this conduct is, therefore, entitled to qualified immunity.

Lin alternatively argues that the summons was issued for pretextual reasons, motivated by Maranzano's concern that the block was "hot" and his desire to "keep some semblance of order" in the area.  Maranzano Dep. 18–19.  Lin also argues that the officers were subjectively motivated to arrest her because she failed to provide identification.  But, where probable cause exists for arrest, much as where reasonable suspicion exists to support an investigative stop, *see Whren v. United States*, 517 U.S. 806 (1996), the arrest may lawfully be made.  That is so regardless of the officer's subjective basis for deciding to exercise enforcement discretion to make, rather than forgo, the arrest.  And it is so regardless whether the police decision to devote resources and time to the infraction is viewed as wise or disproportionate.  "[A]n arrest is not unlawful so long as the officer ha[d] . . . probable cause to believe that the person arrested has committed any crime."  *Zellner v. Summerlin*, 494 F.3d 344, 369 (2d Cir. 2007).  Here, on the undisputed facts, the officers reasonably believed there was probable cause to arrest Lin for a criminal misdemeanor violation of the ABC.  Summary judgment must therefore be entered for the defendants on her false arrest claims, both under § 1983 and state law.

### B.     Malicious Prosecution

To succeed on a malicious prosecution claim under § 1983, a plaintiff must establish the elements of a malicious prosecution claim under New York law along with a violation of her rights under the Fourth Amendment.  *Manganiello v. City of New York*, 612 F.3d 149, 160–61 (2d Cir. 2010).  As such, a plaintiff must show (1) the defendant commenced or continued a

criminal proceeding against the plaintiff; (2) the proceeding was terminated in the plaintiff's favor; (3) there was no probable cause for commencing the proceeding; (4) the proceeding was instituted with "actual malice"; and (5) there was a post-arraignment liberty restraint sufficient to implicate the plaintiff's Fourth Amendment rights. *McKay v. City of New York*, 32 F. Supp. 3d 499, 511 (S.D.N.Y. 2014) (quoting *Rohman v. N.Y.C. Transit Auth.*, 215 F.3d 208, 215 (2d Cir. 2000) (internal quotation marks omitted)); *accord Droz v. McCadden*, 580 F.3d 106, 109 (2d. Cir. 2009); *Drummond v. Castro*, 522 F. Supp. 2d 667, 677 (S.D.N.Y. 2007).

Significant here, the existence of probable cause is a complete defense to a claim of malicious prosecution. *Savino v. City of New York*, 331 F.3d 63, 72 (2d Cir. 2003). And the existence of arguable probable cause entitles the officer to qualified immunity for a claim of malicious prosecution. *McKay*, 32 F. Supp. 3d at 511 (citing *Betts v. Shearman*, 751 F.3d 78, 83 (2d Cir. 2014)). And because the focus of the qualified immunity inquiry is whether the actions of the defendant officer were objectively reasonable, an officer's subjective motivations with regard to the prosecution will not rescue a malicious prosecution claim when there was arguable probable cause for the charge on which the prosecution was based. *Bonide Prods., Inc. v. Cahill*, 223 F.3d 141, 146 (2d. Cir. 2000). As such, an officer with an objectively reasonable belief that an arrest was supported by probable cause is entitled to qualified immunity against a claim of malicious prosecution arising out of the arrest, *id.*, so long as the officer does not learn of facts that would negate the earlier determination of probable cause, *Cooper v. City of New Rochelle*, 925 F. Supp. 2d 588, 611 (S.D.N.Y. 2013).

For three reasons, summary judgment for the defense is required on Lin's malicious prosecution claims.

First, the evidence cannot support a finding that the criminal proceeding against Lin initiated by the summons issued by the officers terminated in her favor.  Here, the summons against Lin was dismissed for legal insufficiency.  *See* Deatley Decl., Ex. M; *see also* Dkt. 80. But it is well-settled such a dismissal does not constitute a favorable termination, as required for a malicious prosecution claim to succeed.  *Carrillos v. Inc. Vill. of Hempstead*, 87 F. Supp. 3d 357, 380 (E.D.N.Y. 2015) (citing *Breen v. Garrison*, 169 F.3d 152, 153 (2d Cir. 1999)).  Rather, such a dismissal is a procedural step, not a determination on the merits of the claim sufficient to satisfy the element of favorable termination.  *See MacFawn v. Kresler*, 666 N.E.2d 1359, 1359–60 (N.Y. 1996) (no favorable termination for malicious prosecution when information charging plaintiff was dismissed because "the facts alleged by the People were not legally sufficient to support the charge" even though State did not amend or re-file the information to correct the deficiency; "[m]anifestly, the criminal action was disposed of on procedural grounds[,] [t]he court did not reach the merits and the question of plaintiff's guilt or innocence remained unanswered after the court dismissed the information").

In response, Lin claims that *Stampf v. Long Island R.R. Co.*, 761 F.3d 192, 201 (2d Cir. 2014), supports her on this point, holding that where the prosecution does not resurrect a criminal complaint dismissed as legally insufficient, the proceeding has been terminated in the plaintiff's favor, so as to permit a malicious prosecution claim.  Lin. Br. 16–18.  But *Stampf* is far afield.  The plaintiff there received a "declination of prosecution" from the New York County District Attorney's Office that stated it was declining to prosecute the action against the plaintiff because the prosecution, after review of the evidence, had "conclude[d] that the case can not be proven beyond a reasonable doubt."  *Stampf*, 761 F.3d at 200 (citation omitted).  The Second Circuit therefore held that "a declination *as received by Stampf* suffices to establish termination

in the plaintiff's favor notwithstanding that the prosecutor is theoretically capable of resurrecting the prosecution." *Id.* at 201 (emphasis added).  There is no evidence, however, that Lin received any such declination of prosecution from the Bronx District Attorney.  Absent such, the dismissal of the summons for legal insufficiency does not reflect a determination about the merits of the case against her, and is not a favorable termination supporting a claim of malicious prosecution.  *See, e.g., Smith-Hunter v. Harvey*, 734 N.E.2d 750, 755 (N.Y. 2000) ("dispositions inconsistent with innocence like the one[] in . . . [*MacFawn*], cannot be viewed as favorable to the accused").

Second, the record lacks evidence that either Sucuzhanay, or any other officer, acted with actual malice in issuing the summons to Lin, initiating her prosecution.  Under New York law, malice requires that "the defendant must have commenced the criminal proceeding due to a wrong or improper motive, something other than a desire to see the ends of justice served." *Lowth v. Town of Cheektowaga*, 82 F.3d 563, 573 (2d Cir. 1996), *amended* (May 21, 1996) (quoting *Nardelli v. Stamberg*, 377 N.E.2d 975, 976 (N.Y. 1978)).  But the record does not supply a non-speculative basis on which to find such malice.

Third, and finally, for the reasons reviewed earlier, the issuance of the summons to Lin was protected by qualified immunity, and Lin has not identified any later information obtained by the officers that would have negated the existence of arguable probable cause.

### C.   Excessive Force

Lin's claim that excessive force was used in effectuating her arrest is brought under § 1983 and state law.

The applicable law is familiar.  "Police officers' application of force is excessive, in violation of the Fourth Amendment, if it is objectively unreasonable 'in light of the facts and

circumstances confronting them, without regard to their underlying intent or motivation.'"
*Maxwell v. City of New York*, 380 F.3d 106, 108 (2d Cir. 2004) (quoting *Graham v. Connor*, 490
U.S. 386, 397 (1989)).  This balancing looks to a number of factors, "including 'the need for the
application of force, the relationship between the need and the amount of force that was used, the
extent of injury inflicted, and whether force was applied in a good faith effort to maintain or
restore discipline or maliciously and sadistically for the very purpose of causing harm.'"
*Figueroa v. Mazza*, 825 F.3d 89, 105 (2d Cir. 2016) (citing *Johnson v. Newburgh Enlarged Sch.
Dist.*, 239 F.3d 246, 251–52 (2d Cir. 2001)).  The evaluation of a police officer's use of force
must be from the understanding of a reasonable police officer at the incident, and not from
hindsight.  *Graham*, 490 U.S. at 396.  "Even if defendants' actions were unreasonable under
current law, qualified immunity protects officers from the sometimes hazy border between
excessive and acceptable force."  *Kerman v. City of New York*, 261 F.3d 229, 239 (2d Cir. 2001)
(alterations, quotation marks, and citation omitted).  "If the officer's mistake as to what the law
requires is reasonable the officer is entitled to the immunity defense."  *Id.* (quotation omitted).
"[I]t is . . . well established that '[n]ot every push or shove, even if it may later seem unnecessary
in the peace of a judge's chambers, violates a prisoner's constitutional rights.'"  *Mesa v. City of
New York*, No. 09 Civ. 10464 (JPO), 2013 WL 31002, at *18 (S.D.N.Y. Jan. 3, 2013) (alterations
in original) (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973)).

　　　"The right to effectuate an arrest does include 'the right to use some degree of physical
coercion.'"  *Mesa*, 2013 WL 31002, *18 (quoting *Esmont v. City of New York*, 371 F. Supp. 2d
202, 214 (E.D.N.Y. 2005).  "Reasonable arrests tend to involve handcuffing the suspect, and
handcuffs lose their effectiveness if they are not attached tightly enough to prevent the arrestee's
hands from slipping out."  *Id.* (quotation omitted).  When a plaintiff suffers a *de minimis* injury,

it is harder for the plaintiff to establish that the force used was excessive, *see Yang Feng Zhao v. City of New York*, 656 F. Supp. 2d 375, 390 (S.D.N.Y. 2009), although a sustained injury that necessitates doctors' visits is not a required element of an excessive force claim, *Robison v. Via*, 821 F.2d 913, 924 (2d Cir. 1987). And, "even if there is an issue of material fact as to the force employed, summary judgment may still be appropriate on qualified immunity grounds, so long as the officers acted in an objectively reasonable manner, given the information available to them at the time they employed the force." *Mesa*, 2013 WL 31002, at *18 (citing *Landy v. Irizarry*, 884 F. Supp. 788, 798 (S.D.N.Y. 1995)).

Here, Lin claims that excessive force was used in several ways in the course of her arrest. In her deposition, Lin testified that (1) after the handcuffs were put on her, the officers "were pushing me and I fall on the floor," Lin Dep. 56; (2) she fell because the officers "were forcing me to walk and so they were trying to grab my arms . . . [a]nd then while they were doing that, then I fall," *id.* at 58, and they "were dragging me very hard and that's why I fall," *id.* at 60; and (3) as for the shove into the police van, "before they took me into the police car, they pushed my back. Before I stepped into the car, he pushed me down and then my tummy was against to the edge of the car before we stepped into the car[.]" *Id.* at 65. Lin does not dispute, however, that this push was by a non-party police officer. Def. 56.1 ¶ 61. Although Lin testified that her hands were red and swollen after her arrest, these marks went away after a few days. Lin Dep. 110. Lin did not commit in testimony whether the handcuffs on her were too tight, stating, "I didn't consider whether the handcuff was tight or not. I only consider my baby at that time." *Id.* at 66. Later the evening of the arrest, after calling the NYPD's Internal Affairs Bureau Command Center, Lin was taken to the hospital after complaining of stomach pain. Def. 56.1. ¶¶ 78–82. Lin also felt dizzy and was vomiting. Lin Dep. 81. She was discharged from the

hospital after receiving care there, Def. 56.1. ¶ 82; the hospital's records from this visit state that Lin "doesn't think she hit the stomach.  No bleeding, no leaking," Deatley Decl., Ex. P, at 301, although Lin did testify that she experienced some vaginal leaking of a fluid after the incident, Lin Dep. 83.

Significantly here, the videotape captures, from multiple angles, Lin's arrest, including her handcuffing, her fall to the floor, and her being escorted from the restaurant to the police van. Such evidence, where incontrovertible, is controlling.  "Incontrovertible evidence relied on by the moving party, such as a relevant videotape whose accuracy is unchallenged, should be credited by the court . . . if it so utterly discredits the opposing party's version that no reasonable juror could fail to believe the version advanced by the moving party." *Zellner v. Summerlin*, 494 F.3d 344, 371 (2d Cir. 2007) (citing *Scott*, 550 U.S. at 378–79).  Here, the videos capture the entirety of Lin's encounter with the police, save two moments: a very small portion of Lin's handcuffing when the camera's view of her was temporarily obscured by the other restaurant employee, and the push of Lin into the police van.  The video evidence is otherwise comprehensive.  It shows that as the officers move to handcuff Lin, she appears to go limp and descend to the floor; Maranzano then lifts her up.  Along with Kaiser, Maranzano then places the handcuffs on Lin, holding her arms in the process.  Holding on to her upper arms, the officers guide Lin out of the restaurant; she appears to drag her feet on the ground as they do so.  When Lin is brought outside the restaurant, she begins to walk with the officers still holding her arms. Video 21:38:00–21:39:00.

To the extent Lin's claims of excessive force are based on the officers' handcuffing of Lin and her fall, the video defeats these claims.  In determining the reasonableness of a handcuffing, the Court considers whether (1) "the handcuffs were unreasonably tight;" (2) "the

defendants ignored the arrestee's pleas that the handcuffs were too tight;" and (3) "the degree of injury to the wrists." *Esmont*, 371 F. Supp. 2d at 215.  To be sure, Lin did not present a physical threat to the officers, and the offense at issue was regulatory and did not involve violence.  As such, the amount of force reasonable here was the minimum needed to arrest her, place her into handcuffs, and take her to the police van.  The Court also appreciates that Lin's arrest was highly distressing and unsettling, especially given her pregnancy.  But, the video evidence unavoidably shows that the force used was constitutionally reasonable.  Lin's handcuffing proceeded routinely and the officers used a reasonable and unremarkable amount of force as they firmly but nonviolently maneuvered her hands behind her back so as permit her handcuffing.  Consistent with this, there is sparse evidence of harm to Lin's wrists and a claim of only *de minimis* injury to them. *See Rincon v. City of New York*, No. 03 Civ. 8276 (LAP), 2005 WL 646080, at *5 (S.D.N.Y. Mar. 21, 2005) ("Aside from the swelling in her wrist, Plaintiff does not allege that Defendants caused any other injuries.  Plaintiff's allegations are *de minimus* and simply do not amount to a constitutional violation."); *Hamlett v. Town of Greenburgh*, No. 05 Civ. 3215 (MDF), 2007 WL 119291, at *3 (S.D.N.Y. Jan. 17, 2007) ("Plaintiff's allegations of brief numbness from the handcuffs and having her arms held behind her back do not rise to the level of force required to sustain an excessive force claim."); *Sulkowska v. City of New York*, 129 F. Supp. 2d 274, 290–91 (S.D.N.Y. 2001) (testimony that handcuffs were tight and that the 72–73 year-old arrestee "was pushed or dragged out of the bar and to the police car" did not establish excessive force because "it was not facially unreasonable to restrain plaintiff's arms and place her in handcuffs, even though she was of advanced age" in arrest for ABC violations and for forgery).  Defendants' handcuffing of Lin was, therefore, objectively reasonable.  As to the

handcuffing, summary judgment is merited for defendants both on the merits and, at a minimum, on grounds of qualified immunity.

The video evidence also defeats Lin's claim of excessive force claim to the extent based on her fall to the ground during the early part of the arrest.  The video shows that Lin falls slowly to the floor and is helped up immediately by Maranzano.  It, significantly, does not show that Maranzano, or any other officer, pushed her to the floor.  Although Lin appears in distress, this appears to be from the fact of the encounter, but Maranzano's conduct preceding the fall—in which he was trying to position her arms behind her back to effect the handcuffing—did not force her to the ground.  The video does not reveal any punching, kicking, or striking of Lin in any way, and the video refutes that she was "yanked" by handcuffs or dropped while handcuffed, actions that might have supported a claim of excessive force.  *See Kalfus v. New York Presbyterian Hosp.*, 706 F. Supp. 2d 458, 473 (S.D.N.Y. Mar. 31, 2010); *see also McMillan v. City of New York*, 10 Civ. 2296 (PAC), 2011 WL 6129627, at *9–10 (S.D.N.Y. Dec. 9, 2011) (when officers struggled to place plaintiff, who was resisting arrest, in handcuffs, officers and plaintiff fell to the ground and plaintiff's face fell first on the floor, receiving a laceration above her eyebrow and other pain, force was not excessive on summary judgment).  On the video evidence, the officers did not push, pull, or compel her fall; Lin appears to have lost her balance.  To the extent that Lin bases her excessive force claim on her fall, therefore, summary judgment is warranted for defendants.  The undisputed and undisputable evidence does not reveal a constitutional violation, let alone one outside the bounds of qualified immunity.

Finally, as to the push of Lin into the police van, the video did not capture this moment.  The only record evidence about it is Lin's deposition testimony.  But this claim fails because there is no evidence that any of the defendants pushed Lin into the van.  Lin testified only that

she was pushed against the side of the police van by a non-party officer, and that "my tummy was against to the edge of the car before we stepped into the car." Lin Dep. 65. And Lin has not adduced any evidence on which the defendant officers could be responsible for any excessive forced used by the non-party officer, such as by failing to intervene while having a reasonable opportunity to do so, *see Jeffreys v. Rossi*, 275 F. Supp. 2d 463, 474 (S.D.N.Y. 2003).[7] Summary judgment thus must be entered for defendants on this aspect of her claim, too, both on the merits and on the basis of qualified immunity.

The Court therefore enters summary judgment for the defendants on Lin's excessive force claims, both under § 1983 and state law.

### D.       Unlawful Search and Seizure

Lin next claims, again under § 1983, that her person and purse were unreasonably seized and searched in connection with her arrest.

As to the searches of her person, Lin challenges as unreasonable the searches (1) at the moment of her arrest, when Maranzano searched the pockets of her coat before handcuffing her,

---

[7] The Court has no occasion to resolve whether the non-defendant officer used excessive force on Lin in connection with her having been pushed into the police van. But on the facts at hand, such an excessive force claim appears problematic. Although Lin's pregnancy was known to the officers by this point in the incident, Lin's testimony is only that her belly "was against [] the edge of the car," Lin Dep. 65, not that she was pushed into that position. As for the push into the police van itself, the case law supports that officers have some latitude to so maneuver a subject into a van before that action can be held unreasonable. *See Esmont*, 371 F. Supp. 2d at 202 (excessive force claim failed on summary judgment when plaintiff was pushed into the back of a police car and plaintiff's head struck the roof of the car, suffering a headache as a result); *Evans v. Solomon*, 681 F. Supp. 2d 233, 251–53 (E.D.N.Y. Jan. 19, 2010) (excessive force claim failed on summary judgment when plaintiff was pushed "with force" against a vehicle, his arm was twisted behind his back, held in place while searched, and officers twisted plaintiff's arm harder when plaintiff tried to turn his head to ask a question, with the amount of force used against him being "hard" and "that it 'hurt'" being reasonable because the police were "were required to apply some force in conducting the search [of plaintiff] because Plaintiff thrice failed to volunteer his driver's license upon request").

Video 21:36:24–21:36:36; and (2) when female officers searched her alongside the police van, Def. 56.1 ¶ 62.

These searches of Lin's person were lawful as incident to arrest.  A search incident to a lawful custodial arrest constitutes an exception to the warrant requirement.  Arresting officers may search "the arrestee's person and the area within his immediate control," meaning the area from which the arrestee might be able to gain possession of a weapon or destructible evidence. *Arizona v. Gant*, 556 U.S. 332, 339 (2009) (quoting *Chimel v. California*, 395 U.S. 752, 763 (1969)); *United States v. Robinson*, 414 U.S. 218, 235 (1973) (police, in connection with lawful arrest, may undertake full search of arrestee's person without any additional justification).  And Maranzano's search of Lin's pockets did not preclude the later, more extensive search of her person minutes later at the van.

As for the search of Lin's purse, it was searched in the restaurant while Lin was in the police van.  Sucuzhanay testified that Maranzano asked the restaurant employee for Lin's wallet. Sucuzhanay Dep. 25.  The restaurant employee then gave Maranzano and Sucuzhanay the purse from behind the counter.  Their search of the purse lasted about 40 seconds and ended when Maranzano found Lin's identification.  Maranzano then exited the restaurant; Sucuzchanay placed items back into the purse and returned the purse to the restaurant employee at the counter. *See* Video 21:39:58–21:40:10; Def. 56.1 ¶¶ 66–67.  With Lin's identification having been found, Lin was given a summons and released from custody.  Def. 56.1 ¶¶ 69, 73.

Unlike the search of Lin's person, the search of Lin's purse cannot be justified as incident to arrest.  That is because, by the time of the search, the purse was far away from Lin, such that she could not have accessed it to grab a weapon or destroy evidence.  She was outdoors by the van; the purse was inside the restaurant by the counter.

Nor, contrary to defendants' claim, was the search a valid inventory search, so as to trigger that exception to the warrant requirement.  An inventory search of an effect taken into custody is proper "(1) to protect the owner's property while it is in police custody; (2) to protect the police against spurious claims of lost or stolen property; and (3) to protect the police from potential danger."  *United States v. Lopez*, 547 F.3d 364, 369 (2d Cir. 2008) (citing *South Dakota v. Opperman*, 428 U.S. 364, 369 (1976)).  But for an inventory search to be proper, it must be conducted under reasonable "standardized procedures."  *Id.* at 370 (citing *Colorado v. Bertine*, 479 U.S. 367, 374 & n.6 (1987)).  Here, there is no evidence that the search of the purse was pursuant to any such procedure, or that the search was undertaken to fulfill any purpose of an inventory search.  On the undisputed facts, the search was instead undertaken to locate Lin's identification, Sucuzhanay Dep. 47, so as to permit the officers to identify her and then release her on a summons.

Defendants alternatively argue that seizing and searching Lin's purse for that purpose was a "reasonable" action to take.  But while the Fourth Amendment requires that a search be reasonable, that requirement is independent of the requirement of a warrant.  There is no freestanding "reasonableness" exception to the warrant requirement.  Instead, a "specifically established and well-delineated exception[]" to that requirement must apply.  *See California v. Acevedo*, 500 U.S. 565, 580 (1991).

Here, disputed facts prevent the Court from determining whether the warrantless seizure and search of Lin's purse were lawful or, if unlawful, protected by qualified immunity.  Although not briefed by the defense, the one exception to the warrant requirement that perhaps could apply is the exception for a consented-to search.  The officers, after all, did not themselves directly grab the purse; the other restaurant employee handed it to Maranzano.  On one

permissible view of the facts, Maranzano requested Lin's purse and the employee voluntarily handed the purse to him; if so, a warrantless search was justified by consent or apparent consent by a person with authority to so consent. *See Illinois v. Rodriguez*, 497 U.S. 177, 186 (1990) (holding a search constitutional when "the facts available to the officers[s] at the moment . . . [would] warrant a man of reasonable caution in the belief that the consenting party had authority over the premises" (internal quotation marks omitted)); *see also Georgia v. Randolph*, 547 U.S. 103, 111 (2006) (noting that the reasonableness of a consent search is informed by "widely shared social expectations").  But the evidence would also permit a different conclusion, under which Maranzano demanded the wallet from the restaurant employee, and the employee's action in reaching for the purse on a shelf underneath the counter and handing it to Maranzano was not voluntary but compulsory—a capitulation to a demand.  Which version is credited depends heavily on what the officers said and how they said it.  Because the video is silent, its depiction of the events regarding the purse, *see* Video 21:39:07–21:40:22, does not resolve this issue.  And the only relevant deposition testimony—Sucuzhanay's bare statement that Maranzano "asked" the restaurant employee for Lin's wallet, *see* Sucuzhanay Dep. 25—is inadequate, without more, to conclusively establish voluntary consent.

The trial evidence on this point—which may include testimony from Maranzano, Sucuzhanay, the restaurant employee, or perhaps other percipient witnesses—may ultimately support a finding of actual or apparent consent.  The jury may find that a person with actual or apparent authority to consent to search communicated such voluntary consent.  Such would legally justify the warrantless search.  And the search was otherwise lawful, in that it was reasonable in purpose, scope, and duration.  Lin had been unable to produce identification, preventing the police from proceeding against her by means of summons.  And issuing a

summons for the infraction—as opposed to arresting the pregnant Lin and transporting her to the police station while her identity was determined—was sensible, not to mention humane.[8]  But, because the facts on which a finding of consent would depend are in dispute, summary judgment on this claim is unavailable.  Lin's search and seizure claim under § 1983 as to the two officers must proceed to trial.[9]

### E. Municipal Liability

Lin next brings a municipal liability claim under *Monell v. Dept. of Soc. Servs. of the City of New York*, 436 U.S. 658 (1978), against the City, O'Neill, Greene, Maranzano, and Hughes for the allegedly negligent training, hiring, supervision, and retention of the defendant officers.  Lin claims that these defendants were aware that NYPD officers would encounter non-native English speakers or pregnant or physically fragile persons in performing their duties, but were constitutionally inadequate in the training, hiring, supervision, and retention of these officers.  *See* Complaint ¶¶ 96–105.  The Court put off discovery for this claim until resolution of defendants' instant motion for summary judgment.  *See* Dkt. 37.  Accordingly, the Court assesses whether this claim can survive as a matter of law.

Municipal liability under § 1983 may not be based on a theory of *respondeat superior*.  *Simpson v. Town of Warwick Police Dept.*, 159 F. Supp. 3d 419, 431 (S.D.N.Y. 2016) (citing *Monell*, 436 U.S. at 691).  Instead, "[t]o hold a city liable under § 1983 for the unconstitutional actions of its employees, a plaintiff is required to plead and prove three elements: (1) an official

---

[8] For this reason, it is hard to see how a finding that the search of the purse was unlawful could yield Lin more than nominal damages.  The search *benefited* Lin by resulting in her release minutes later.

[9] Lin did not pursue a state-law claim based on the search and seizure of her purse.  Complaint ¶¶ 73–81.  There is, therefore, no claim for *respondeat superior* brought against the City or supervisory personnel based on such conduct.

policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." *Wray v. City of New York*, 490 F.3d 189, 195 (2d Cir. 2007) (citing *Batista v. Rodriguez*, 702 F.2d 393, 397 (2d Cir. 1983)). "The failure to train or supervise city employees may constitute an official policy or custom if the failure amounts to 'deliberate indifference' to the rights of those with whom the city employees interact." *Id.* (citing *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)). "'Deliberate indifference' involves the conscious disregard of the risk that poorly-trained employees will cause deprivations of clearly established constitutional rights." *Id.* at 196 (citing *Amnesty Am. v. Town of West Hartford*, 361 F.3d 113, 127 n.8 (2d Cir. 2004)).

This claim fails. Although Lin has recited the bare the elements of such a claim, *see* Complaint ¶¶ 48–49, 96–105, she has not pled any non-conclusory facts indicating that the defendants on this claim acted with deliberate indifference towards the training, hiring, supervision, and retention of NYPD officers, so as to cause deprivations of clearly established constitutional rights. Instead, the complaint simply recites the elements of a *Monell* municipal liability claim as set out in *Wray* without pleading any factual content about the nature of the relevant training program, the way it contributed to the alleged violation, or about how policymaking officials acted deliberately indifferent in the face of a need for supervision. *See Amnesty Am.*, 316 F.3d 127 n.8. Accordingly, Lin's municipal liability claim fails as a matter of law.

### F.    Assault and Battery

Lin also brings a state-law claim against defendants for assault and battery and, based on it, claims against the City and O'Neill on a theory of *respondeat superior*. Complaint ¶¶ 106–11. Summary judgment for the defense is required on these claims. Lin's claim of assault and

battery stems entirely from her arrest.  While the use of force to effect an unlawful arrest may

constitute assault and battery, *Graham v. City of New York*, 928 F. Supp. 2d 610, 624–25

(E.D.N.Y. 2013), the arrest here was lawful.  And while excessive force in effecting a lawful

arrest may support a claim for assault and battery, *see Pelayo v. Port Auth.*, 893 F. Supp. 2d 632,

642 (S.D.N.Y. 2012), the Court has granted summary judgment to the defendants on Lin's claim

of excessive force.  *See Humphrey v. Landers*, 344 F. App'x 686, 688 (2d Cir. 2009) (summary

order) (assault and battery claim under New York law is "substantially identical" to a § 1983

claim for excessive force) (quoting *Posr*, 944 F.2d at 94–95).  Summary judgment for the

defendants on Lin's assault and battery claims is therefore required.

## CONCLUSION

For the foregoing reasons, the Court grants defendants' motion for summary judgment on

all of Lin's claims, except for her claim under § 1983 against Officers Maranzano and

Sucuzhanay of an illegal search and seizure to the extent based on the search and seizure of her

purse.  That claim survives and, barring settlement, will proceed to trial.

The Court directs counsel to meet and confer in person by Friday, January 13, 2017, to

discuss potential settlement of this matter, and to submit a letter to the Court by Tuesday,

January 17, 2017, reporting on whether the case has settled.  If it does not, the Court will set a

prompt schedule for pretrial submissions and, thereafter, a trial date.

The Clerk of Court is respectfully directed to terminate the motion pending at Dkt. 67.

SO ORDERED.

*Paul A. Engelmayer*

Paul A. Engelmayer
United States District Judge

Dated: December 21, 2016
      New York, New York